IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CONLEY WOLFORD,

        Plaintiff,

v.                              Civil Action No. 1:07-CV-83

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I. Introduction**

A.    <u>Background</u>

      Plaintiff, Conley Wolford, (Claimant), filed a Complaint on June 19, 2007, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on

February 1, 2008.[2]  Claimant filed his Motion for Summary Judgment on March 3, 2008.[3]

Commissioner filed his Motion for Summary Judgment on April 2, 2008.[4]

B.    <u>The Pleadings</u>

      1.    <u>Plaintiff's Brief in Support of Motion for Summary Judgment</u>.

      2.    <u>Defendant's Brief in Support of Motion for Summary Judgment</u>.

---

[1] Docket No. 1.

[2] Docket No. 11.

[3] Docket No. 14.

[4] Docket No. 15.

C.    Recommendation

I recommend that:

1.    Claimant's Motion for Summary Judgment be **DENIED** because the ALJ, as ordered on remand, complied with the Fourth Circuit mandate set forth in Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986) by explaining his rationale for concluding claimant's spinal impairment did not meet or equal listing 1.04. The undersigned finds the ALJ's decision is supported by substantial evidence.

2.    Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

## II. Facts

A.    Procedural History

Claimant initially filed an application for Supplemental Security Income ("SSI") benefits on February 20, 1996. (Tr. 514). That application was denied on April 22, 1996 and no appeal was filed. (Tr. 514). On February 25, 1997, claimant filed a subsequent SSI application alleging the onset date of disability to be November 7, 1995 due to orthopedic problems, memory problems, depression, headaches, hearing loss, blackouts, vision loss, epigastric disturbances, and pain. (Tr. 17, 229). This application is the subject of this action. A hearing was held on April 15, 1999 at which claimant, his wife and a vocational expert testified. (Tr. 559). The ALJ denied the claim by written decision on September 7, 1999, finding that claimant was not disabled because he could perform work that existed in significant numbers in the local and national economy. (Tr. 17, 534). Claimant's Request for Review was timely filed and during the pendency of that Request for Review, a new application was filed and granted on initial

application.[5]  The Appeals Council refused to review the ALJ's decision on the original claim on April 19, 2002.  (Tr. 555).

A civil action was filed with this Court on June 24, 2002.  Magistrate Judge Kaull recommended remand of the case so that the Commissioner can articulate the reasons why the claimant's cervical impairment failed to meet the criteria in listing § 1.05C[6] on September 28, 2004.  (Tr. 601).  District Court Judge Robert Maxwell adopted this recommendation on October 21, 2004.  (Tr. 620).  A second hearing was held on June 2, 2005.  (Tr. 630).  Again, the ALJ denied the claim by written decision on November 1, 2005.  (Tr. 514).  Written exceptions to the ALJ's findings were filed with the Appeals Council, and the Appeals Council declined jurisdiction on April 17, 2007.  (Tr. 506).  Therefore, the ALJ's November 1, 2005 decision stands as the final decision of the Commissioner in this case.  Having exhausted his administrative remedies, claimant filed this action, which proceeded as set forth above.

B.    Personal History

Claimant was forty-three years old on the alleged onset date of November 7, 1995.  His date of birth is January 17, 1952.  (Tr. 229).  Claimant was therefore a "younger individual 18-

---

[5] Claimant was found disabled as of June 1, 2000.  (Tr. 632).  Therefore, the relevant time period at issue in this case is November 7, 1995 through June 1, 2000.

[6] Listing 1.05C has since been replaced by Listing 1.04.  See 66 Fed. Reg. 58,010, 58,017-18 (Nov. 19, 2001); 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.04 (2002).  Plaintiff correctly states that it is listing 1.04 that applies to his claim.  In publishing the new listings, the SSA stated that "[w]ith respect to claims in which we have made a final decision, and that are pending judicial review in Federal court, we expect that the court's review of the Commissioner's final decision would be made in accordance with the [listings] in effect at the time of the final decision."  66 Fed. Reg. 58,010, 58,011.  The Court notes that listing 1.05, as currently numbered, pertains to amputations and is not at issue here.  See 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.05 (2002).  All references to listing 1.05C in the text of this R&R are to the previous version of 1.05, which addressed spine disorders.

44" within the meaning of the regulations prior to January 17, 1997. From that date through June 1, 2000, he has been a "younger individual 45-49" within the meaning of the regulations. 20 C.F.R. § 416.968. Claimant graduated from high school. (Tr. 563). Claimant has prior work experience as a driver, as well as loading trucks and developing photographs for a newspaper office. (Tr. 564). Claimant has also worked at a saw mill and as a janitor. (Tr. 565).

C.     Medical History

The following medical history is relevant to the single issue of whether the ALJ erred in concluding that Claimant did not meet or equal listing 1.04:

**Alvaro Gutierrez, M.D., March, 1997-April, 1998 (Tr. 92-106)**
Dr. Gutierrez reports that claimant had normal reflexes and gait, and a normal sensory examination.

**UHA-Physician Office Center, October 21, 1997 (Tr. 100)**
Outpatient History and Physical Examination:
Normal reflexes and gait and a normal sensory examination.

**JoAnn Miller, M.D., March 19, 1998 (Tr. 109)**
No cervical pain with good range of motion. Neurological examination was grossly intact except for nystagmus with intact sensation. Claimant had no joint synovitis showing no evidence of rheumatoid arthritis.

**WVU Family Practice, Regular Treatments (Tr. 137-173)**
January 1998 Evaluation:
Decreased range of motion, loss of reflex in both upper extremities, decreased strength in left arm, pain with internal and external rotation of the left arm, decreased sensation to sharp and dull touch, in ability to touch thumb to fingertips, and decreased grip in both hands.

**Dr. Stephen D. Herto, November 8, 1995 (Tr. 313-330)**
MRI:
Demonstrated a clearly defined herniation of the C5-6 intervertebral disc which was central and extended toward the left, as well as a smaller disc bulge at C6-07.

In his report, Dr. Herto also discussed an MRI dated February 26, 1996. It found C5-6 left paracentral disc herniation, unchanged as compared to previous examination.

**Kenneth J. Ratajczak, M.D., October 31, 1996 (Tr. 331)**

4

Cervical X-ray revealed osteophytes at C6-7 with disc space narrowing, indicating degenerative joint disease and degenerative disc disease.

**Preston Physical Therapy, March 20, 1996-November 11, 1996 (Tr. 333-386)**
Records indicate slow, partial improvement in claimant's symptoms and strength.

Physical Findings:
Decreased range of motion, decreased strength in the arms and hand grips, decreased reflexes, muscle spasms and parasthesia.

**Donald Hoffman, M.D., March, 1996-March, 1997 (Tr. 393-423)**
Treatment notes show no significant evidence of cervical nerve root compression.
March 12, 1996:
Subjective Complaint:
Claimant described low back pain and neck pain radiating into his head causing headaches, and occasionally radiating into his arms and hands.

Summary of Two Earlier MRIs:
Large bulging discs at C5-6 and C6-7 with narrowing of the neural foramina bilaterally, and prominent osteophytic changes.

Examination:
Spontaneous nystagmus in primary gaze, bilateral weakness of the triceps, giveaway weakness secondary to pain, decreased reflexes of the biceps and brachial radialis, very slow and limited range of motion of the neck, positive straight leg raising at 45 degrees bilaterally supine but not seated, and diffuse neck and back muscle spasm.

Conclusion:
Symptoms very suggestive of radiculopathy, most likely at the C7 root, but probably also at the C6 root as well, bilaterally. This pain has been incompletely relieved by chiropractic manipulation. The MRI documents narrowed neural foramina at C5-6, as well as C6-7 level, which are appropriate for his symptoms.

Recommendation:
Trial of physical therapy and Fioricet and Lorazepam for spasm and pain.

April 23, 1996
Examination:
Decreased range of motion and decreased strength. EMG necessary because of the pronounced weakness in C7 muscle groups on the left along with MRI showing left sided disc herniations at C5-6 and C6-7. The EMG suggested a chronic C7-8 radiculopathy on the left and is consistent with patient's symptoms. No active denervation on the EMG.

Recommendation:

Continued conservative care. Prescribed Notriptyline and Carisoprodol. Discussed the potential long-term chronic nature of the problem.

April 25, 1996 Response to Dr. Galey's Report:

Dr. Hoffman disagreed with Dr. Galey's opinion, including his recommendation of a myelogram and CT scan, stating there was no evidence of myelopathy and the EMG was negative for active denervation, but showed some process of reinnervation. He concluded that there was no evidence of spinal cord compression, no need for a myelogram, and he did not think surgery was an option. There were no significant abnormalities on the EMG. He noted that the claimant complained of bilateral rediculopathy symptoms when the radiologic evidence revealed problems only on the left. He opined claimant was making very slow progress and was not optimistic about claimant's return to work "any time soon." He stated claimant's restrictions as follows:

> I think he can probably alternate sitting and standing every few hours, undergo short distances of walking and short driving distances if any due to stiffness of his neck. I would not have him reaching above shoulder level or pushing or pulling any significant weight nor crawling, crouching, bending, stooping or climbing due to stiffness present in his neck. It appears that he should be able to lift ten pounds and perform simple grasping and fine manipulation with both hands. Marked changes in temperature might exacerbate his symptoms. I wouldn't recommend working at heights at this time due to stiffness in his neck. I don't see any problem with dust or fumes. He does not appear to have reached maximum improvement.

May 1996:

Progress appeared poor as new symptoms were appearing such as an unexplained sore spot on the right foot, and multiple, vague complaints involving all four extremities. No definite radicular signs upon examination. Claimant's supine straight leg raising test was "very exaggerated" and "out of proportion" to his seated straight leg raising test. He believed claimant was exaggerating his symptoms, opining that the discrepancies were possibly related to claimant's lawsuit regarding his disability claim. He noted that claimant's wife stated that he would never work again. Dr. Hoffman also opined that he believed there was no way to get claimant back to work before a settlement occurred. Dr. Hoffman opined that claimant should be able to return to some type of gainful employment and referred him for Vocational Assessment.

July 1996:

Examination:

Reflexes are intact. Straight leg raise testing in the seated position is negative to 180 degrees of knee extension and 90 degrees of hip flexion. MRI was reviewed. This reveals posterior bulging discs at L3-4, L4-5 and more so at L5-S1. On the axial views there did not appear to be any nerve root involvement.

Impressions:

Exam continues to show a very marked asymmetry between straight leg raise testing seated and supine, and in the supine and prone position there is much augmentation to any type of movement. There are no convincing radicular signs.

Plan:
[Patient] should try to start up in some light work, but there is resistance to this idea.

August 6, 1996:
Examination:
Mild chronic changes at C7-8, and no clinical findings of cervical or lumbar pain in a neuro-anatomic distribution. No true radicular symptoms nor radicular signs.

March 1997:
Final Report:
Diagnosis - cervical and lumbar strain with no clinical findings of cervical or lumpar pain in a neuro-anatomic distribution.

**Orthopedist Dr. Patrick Galey, March 19, 1996 (Tr. 402-424)**
Examination:
Decreased range of motion with pain and significant hyper-reflexia of the ankle reflexes, greater on the right.

Conclusion:
Physical examination strongly suggests the claimant has a mild cervical myelopathy.

Recommendation:
Cervical myelogram and CT scan to determine the amount of compression of the spinal cord.

**Dr. John France, September 3, 1996 (Tr. 425)**
Examination:
Decreased grip strength, decreased wrist flexion strength on the left, and decreased biceps and triceps strength bilaterally. Minimal weakness with no loss of sensation in the upper extremities and negative straight-leg raising in the sitting position. Lumbar spine imaging studies showed only minimal degenerative changes. Dr. France opined that claimant should consider returning to light duty work if he was able to tolerate it. He assessed claimant's pain as mostly muscle ligamentous in nature, and recommended no biomechanical restrictions. He did recommend restrictions based on claimant's subjective complaints.

D.      Testimonial Evidence

Testimony was taken at a hearing held on April 15, 1999.[7]  The following portions of the testimony are relevant to the disposition of the case:

Q      Okay.  And where were you working at the time?

A      Newspaper office.

Q      Right.  And were you doing delivery of newspapers?

A      Not at the time of the accident.

Q      But I mean - - okay.  What were you doing at the newspaper office?

A      Do - - they just Jack of all trades.

Q      Okay.

A      That's all I know.  What ever they had me to do.

Q      For instance, did you load trucks?

A      Yeah, I loaded them, worked in the dark room.  I remember taking the pictures, shrinking them or enlarging them or something.

Q      Okay.

A      To fit the newspaper.

Q      And you worked there for about three or four months, maybe five months, six months.  Was it a short period of time?

A      Yeah, it was just - -

Q      Okay.  Now during that same period of time did you deliver meals for the Preston County senior citizens?

[7] Upon remand, a second hearing was held on June 2, 2005.  There was no relevant testimony offered at that time.

A       Prior to that I think.

Q       Okay.  And did they pay you for that?

A       Yeah.

Q       Then in 1993 did you work for Sanders Sawmill?

A       I don't remember back that far.

ALJ           You'll have to speak up a little bit, sir.

BY CLAIMANT:

A       I don't remember back that far.

Q       Did you ever work at a sawmill?

A       I started out working on a sawmill years ago.

Q       Okay.  And just as a laborer?

A       Yeah.

Q       And do you remember years ago working as a janitor?

A       Not really.

Q       Okay.  Can you - - okay.  Can you think of any other jobs you've ever done for
pay?

A       No.

Q       Okay.  When you had your car accident in 1995 were you hurt?

A       My chiropractor said I was.

Q       Okay.  What hurt?

A       My neck and my lower back.

Q       Okay.  And as a result of the accident did you then tell the newspaper that you

weren't able to go back to work?

A     Yes.

Q     And right after the accident how did your neck and back feel?

A     It was on and off it would hurt and I couldn't do anything.  I - - the chiropractor had me doing light exercises like walking a little.  And that - - I think that's what happened I was coming back from my walk when I hurt my hip.

                    *              *              *

Q     Okay.  Let's talk about your neck and your arms.  Okay?  Do you have pain in your neck?

A     Yeah, right now and this shoulder.

Q     And you're pointing to your right shoulder?

A     Yes.

Q     Is your right side worse than your left side?

A     I - - the left shoulder seems okay but I'm right-handed and this is the shoulder that hurts all the time.

Q     Okay.

A     The doctors call it something.  I don't remember what they said it was.

Q     And does the pain just stay in your shoulder or does it go down into your arm?

A     I remember that one doctor said he could hear it clicking in there.  I don't remember what he called it.

Q     Okay.  Does the pain stay in your shoulder or does it run down in your arm?

A     It usually stays in the shoulder and sometimes if I lay on it wrong my whole arm

goes numb.

Q    Okay.  Does it affect the use of your hand?

A    And my hand swells up sometimes, my knuckles on my right hand.

Q    And do you ever have any pain in your hand?

A    It's hurting some right now.  The knuckles are swelled up.

Q    Can you turn your head from side to side?

A    Yes, slowly.

Q    Can you make the full rotation?

A    No, ma'am.

Q    Okay.  Do you drive a car?

A    I haven't driven that I know of for a long time.

Q    What do you mean by a long time?

A    I don't remember when the last time was that I drove.

Q    Okay.  Why don't you drive?

A    If I don't remember that the chiropractor I had told me not to drive.

Q    And why?

A    Because of my neck, not being able to move it enough to see other people coming at you or to the side.

Q    Okay.  Now over the course of your illness you've had physical therapy?

A    Yeah I think prior to this head injury.  I think that's what happened.

Q    Okay.  And has any doctor told you that you should be doing something that you haven't done?

A       I don't know.  Not that I know of.

Q       Do you have difficulty sitting?

A       Yeah my back hurts a lot.  And I go to lay down on my side and that's where I spend most of my time in bed, laying on my left side.

Q       Okay.  How long can you sit?  You've been sitting here now for about 20 minutes or 25 minutes.  How long can you sit without your lower back hurting?

A       It was hurting when I came in so.

Q       Okay.   How long can you stand and force yourself to sit?

A       Not very long.  I'm supposed to take walks every morning but I can't make it very far outside.

Q       Okay.  So how far or how long can you walk?

A       I really can't answer that.  All I know is I go out in the backyard sometimes.

ALJ       Is that where you walk in the morning, in the backyard?

CLMT       Yes sir.

ALJ       And do you try to do that every morning?

CLMT       I try to.

ALJ       What time of day?

CLMT       After the kids go to school.  They were off for a good while here a little while ago, like ten days or something.  And they'd get me to go out every morning.  But if nobody's there I usually don't go out.

                    *               *               *

Q       Okay.  Are you able to bend?

A       Well, I was out in the yard and tried that.  She says it was on my birthday.  My back - - I couldn't stand back up.  I was just froze in that position until they came out and helped me.  And then she said it happened again a month or so later.  I don't always remember that stuff happening.  And I know I have a lot of trouble walking.

Q       What in particular bothers you about walking?

A       My hip, my right hip. I think that's why I was going to that therapy you mentioned earlier.

*                    *                    *

ATTY       Okay.  Do any of the other medications do you notice any difference in how you feel after you've taken any of the other medications that you're on?

CLMT       She gives me something for my back and sometimes they upset my stomach and give me diarrhea and - -

ALJ       Now that cane, how long have you been using that cane?

CLMT       Since my mom gave it to me right after I - - she said right after the accident.  She said my dad made it.

ALJ       You've been using it since you had the car accident?

CLMT       Yes, sir.  She said my dad made this when I was a little boy.  I remember he made axe handles out of hickory when I was little.

*                    *                    *

Q       After Mr. Conley's accident, car accident, but before he hit his head, do you recall what kind of condition he was in?

A       He had back pain.  He talked.  I could give him things to do, appointments to

13

make, you know, just about anything you could want while I was at work or something that he could do. And he would do it and everything and then after his head injury he would - - I could tell him - - if I didn't write it down he would forget it.

Q    Okay. So I want to get to the mental in a second. But right now I just want to try and talk about the physical.

A    Um-hum.

Q    Do you recall physically what he was able to do before the head injury? Was he able to - - would he have been able to work, you know, this is the critical question?

A    Yeah, if it didn't involve a lot of lifting. Like I said with his back problem and stuff it depends on - - because his back does go out on him, it still does. He had two episodes just since the first of the year and he would have to lay in bed, he can't hardly walk, I'd have to help him get out of bed.

Q    And what caused those two exacerbations this year that you just mentioned?

A    Just walking and if he would bend over to pick something up he couldn't straighten back up it would just pop out.

Q    Okay. And has that been pretty consistent since - -

A    He had one in January and then again in February.

Q    And has that been a problem that he's had ever since the car accident?

A    Since the car accident.

Q    Okay. And after the head injury, besides the mental, did his physical condition get worse?

A    No not really. As long as he could - - if he watched how he bent over or watched

14

how he walked or something and didn't lift, like bend over and lift something up or something, he could do things.

Q        Okay.  What about his neck and his arm, did that get worse after the head injury in 1996?  If you can remember.

A        It got worse because of the headaches.  I think the headaches make it worse on him because he says the pain shoots down from his - - sometimes it shoots down like from his head into his shoulder with the headaches.

                                *                *                *

Q        Does he see anybody for his orthopedic conditions, back, neck or that type of thing?

A        He sees the physician's assistant.  Her name is Cora, her first name's Cora, and her last name's Darra.

Q        Who's assistant is she?  What doctor?

A        I'm not sure who her doctor is, who she's under.  She's never told me.

Q        How often does he see that person?

A        About every three, two to three months.

Q        And what does she do for him?

A        Well if he has - - like his back pain, she follows up on it, if he needs more medication for it.  If he has like any general problems and she asked him about his head injury and how his head injury's doing.  If he needs anything for sleeping, she prescribes that.

                                *                *                *

E.        Lifestyle Evidence

The following evidence concerning claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how claimant's alleged impairments affect his daily life:

Claimant does not drive.  (Tr. 572)

Claimant has difficulty sitting.  (Tr. 573)

Claimant walks every morning in his backyard.  (Tr. 573)

Claimant has trouble bending and walking.  (Tr. 577)

Claimant uses a cane.  (Tr. 582)

### III.  The Motions for Summary Judgment

A.        Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, claimant alleges that his condition satisfies the requirements of listing 1.04 and the claim should be remanded for payment of benefits for the time period from November 7, 2005 through June 1, 2000.

Commissioner maintains that substantial evidence supports the Commissioner's decision that claimant did not meet or equal listing 1.04A.

B.        The Standards.

1.        Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial

burden of showing the absence of any issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  <u>Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v.  Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

2. <u>Judicial Review</u>.  Only a final determination of the Commissioner may receive judicial review.  <u>See</u> 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

3. <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4. <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5. <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42

U.S.C. §§ 416(I), 423C; Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.      Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.      Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether Claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the Claimant can perform her past work; and 5) whether the Claimant is capable of performing

any work in the national economy. Once Claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the Claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the Claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

10. Social Security - Substantial Evidence - Listed Impairment. In order for the reviewing court to determine if the Secretary based the agency's decision on substantial evidence, the decision must include the reasons for the determination that the impairment does not meet or equal a listed impairment. Cook, 783 F.2d at 1168. The ALJ must identify the standard to be applied. Id. At 1173. The ALJ should compare each of the listed criteria to the evidence of Claimant's symptoms and explore all relevant facts. Id

11. Social Security - Severe Impairment. An impairment is severe when, whether by itself or in combination with other impairments, it significantly limits a Claimant's physical or mental abilities to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a). See also Byrd v. Apfel, No. 98-1781, slip op. at 2 (4th Cir. Dec. 31, 1998)[8]; Social Security Ruling 85-28.

12. Social Security - Listing. The ALJ must fully analyze whether a Claimant's impairment meets or equals a "Listing" where there is factual support that a listing could be met. Cook , 783 F.2d at 1168. Cook "does not establish an inflexible rule requiring an exhaustive

---

[8] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

point-by-point discussion in all cases." <u>Russell v. Chater</u>, No. 94-2371 (4th Cir. July 7, 1995) (unpublished).[9]  In determining disability, the ALJ is required to determine whether Claimant's condition is medically equal in severity to a listing.  20 C.F.R. §§ 404.1529(d)(3), 416.929(d)(3). The ALJ is required to explain his findings at each step of the evaluation process so that the reviewing court can make determinations on whether his decision is supported by substantial evidence.  <u>Gordon</u>, 725 F.2d 231.  <u>See also</u> <u>Myers v. Califano</u>, 611 F.2d 980, 983 (4th Cir. 1980).

13.     <u>Social Security - Claimant's Credibility</u>.  "Because he had the opportunity to observe the demeanor and to determine the credibility of the Claimant, the ALJ's observations concerning these questions are to be given great weight."  <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984) citing <u>Tyler v. Weinberger</u>, 409 F. Supp. 776 (E.D. Va. 1976).  "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference.  <u>See</u> <u>Nelson v. Apfel</u>, 131 F.3d 1228, 1237 (7th Cir. 1997).  We will reverse an ALJ's credibility determination only if the Claimant can show it was 'patently wrong'" <u>Powers v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000) citing <u>Herr v. Sullivan</u>, 912 F.2d 178, 181 (7th Cir. 1990).

C.     <u>Discussion</u>

1.     <u>Whether the ALJ Erred in Finding Claimant Did Not Meet or Equal Listing 1.04</u>

Claimant contends the ALJ's finding that his condition does not meet listing 1.04 is not supported by substantial evidence.  The ALJ based his decision, in part, upon the fact that he did not find claimant's testimony to be entirely credible.  The ALJ relied on notes of symptom magnification involving claimant's lower back in making this determination.  Claimant believes

---

[9] See FN 7.

there was objective medical evidence of record documenting each of the requirements of listing 1.04 and that the ALJ erred in basing his decision on claimant's lack of credibility.

Commissioner contends that the ALJ properly determined that claimant did not meet or equal listing 1.04A. Specifically, Commissioner maintains that claimant failed to show evidence of nerve root compression, cervical or lumbar pain in a neuro-anatomic distribution or a limitation of motion of the spine and motor loss.

20 C.F.R., Part 404, Subpt. P., App. 1, § 1.04A reads as follows:

1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);...

The ALJ, in his decision, found the following: "The medical evidence of record discussed both in the prior decision and by the magistrate judge, when examined in light of the claimant's significant symptom magnification that the Administrative Law Judge continues to find, which was not commented upon by the magistrate judge, does not support a finding that he has a vertebrogenic impairment that meets or equals Listing 1.04." (Tr. 517). "The medical evidence of record does not show persistent objective clinical signs over the longitudinal period required by listing 1.04 to meet or medically equal the listing for a cervical or lumbar impairment." (Tr. 518).

It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the

21

Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary. Hays, 907 F.2d at 1456.

The Fourth Circuit has held that the decision of an ALJ must explain its rationale when determining that a plaintiff's specific injury does not meet or equal a listed impairment. See Cook, 783 F.2d at 1172. "This requires an ALJ to compare the plaintiff's actual symptoms to the requirements of any relevant listed impairments in more than a "summary way." Id. at 1173. The ALJ is required to give more than a mere conclusory analysis of the plaintiff's impairments pursuant to the regulatory listings. Warner v. Barnhart, Civil Action No. 1:04-CV-8, p 7-9, 11 (Final Order of J. Stamp, filed March 29, 2005).[10]

In Cook, 783 F.2d at 1172-73, the ALJ concluded the claimant's arthritis impairment did not "meet or equal in severity the requirements of Section 1.10 of Appendix 1, Subpart P as there is no joint enlargement, deformity, effusion, or the other mandated criteria." The Court found the ALJ's explanation was deficient because the ALJ failed to explain the reasons behind his conclusion the claimant's impairment did not meet or equal a Listing. Id. at 1172. It held the ALJ should have, but failed to, compare the claimant's symptoms with the criteria of the relevant Listing. Id. at 1173. The Court concluded that without such explanation by the ALJ, it was "simply impossible to tell whether there is substantial evidence to support the determination." Id.

In the present case, Magistrate Judge Kaull's recommendation, as adopted by Judge Maxwell, was for the ALJ, on remand, to "compare Plaintiff's symptoms to the requirements of Listing 1.05C, which Plaintiff had argued on several occasions, was relevant to his neck

---

[10] See FN 7.

impairment." (Tr. 617). On remand, the ALJ conducted the analysis in accordance with Cook in that he identified the listed impairment and, throughout his decision, compared the listed criteria to the specific opinions and objective medical findings of Drs. Hoffman, Galey, France, Gutierrez and Miller, which led him to conclude that claimant did not meet all the specified criteria of listing 1.04A. The ALJ undertook an in-depth analysis of the evidence relating to claimant's spinal impairment and identified what evidence he relied on when concluding claimant's impairment did not meet or equal listing 1.04.

The ALJ reviewed and evaluated the evidence of Dr. Hoffman, who examined claimant frequently and who found claimant showed no significant evidence of nerve root compression. (Tr. 408). As reported in Dr. Hoffman's letter of April 25, 1996, while [claimant] had neck pain, the physical examination showed no evidence of cervical myelopathy, no major radicular symptoms, and no evidence for cord compression. (Id.). The EMG showed no significant abnormalities. (Id.). Dr. Hoffman examined claimant again on July 11, 1996. (Tr. 417). The examination showed no convincing radicular signs with the diagnoses being chronic neck and low back pain without evidence of radicular features. (Id.). Claimant continued to have very marked asymmetry between straight leg raise testing seated and supine. (Id.). Dr. Hoffman's last physical examination was on August 6, 1996 at which time the claimant denied having persistent numbness and there were no specific radicular like pains reported. (Tr. 421). Dr. Hoffman again reported after the physical examination that the claimant had no true radicular symptoms nor radicular signs. (Id.). The marked asymmetry in straight leg testing was again noted. (Id.). Dr. Hoffman's final medical report was on March 27, 1997. (Tr. 393-97). He diagnosed claimant with cervical and lumbar strain, noting the mild chronic changes at C7-8

shown on the EMG, with no clinical findings of cervical or lumbar pain in a neuro-anatomic distribution. (Id.). Dr. Hoffman again repeated his objective observation of very augmented pain behavior suggesting malingering with negative straight leg raising while seated but very pronounced while supine. (Id.).

Another examining specialist, J. Patrick Galey, M.D., reported on March 19, 1996 that the claimant had normal motor power and reflexes in the upper extremities. The diagnosis was mild cervical myelopathy. (Tr. 402-24).

On September 3, 1996, claimant was examined by John France, M.D., who reported minimal weakness with no loss of sensation in the upper extremities and negative straight leg raising in the sitting position. (Tr. 425-26). Dr. France also noted that lumbar spine imaging studies showed only minimal degenerative changes, and opined that the claimant could perform light work with no biomechanical restrictions, and recommended increased activities. This was the last time claimant sought treatment for his cervical or lumbar impairments.

Claimant sustained a closed head injury after falling near his home in November, 1996. Claimant was seen by neurologist Alvaro Gutierrez, M.D. (Tr. 92-106), who reported that claimant's physical examination was unremarkable with an essentially normal neurological examination with normal reflexes in all extremities. There was no vertebrogenic diagnosis. Another physical examination on October 21, 1997 reported normal reflexes and gait, and normal sensory examination. Another physical examination by Dr. Gutierrez on February 3, 1998 again reported normal reflexes and gait, and normal sensory examination, with all of claimant's subjective complaints relating to his closed head injury, with no complaints of cervical or lumbar symptoms.

Claimant was examined by rheumatologist JoAnn Miller, M.D. on March 19, 1998, at which time his pain complaints were only joint pain, and he gave no history of any cervical or lumbar impairments and reported no paresthesia except when he uses his hands "a lot." (Tr. 109-10). The physical examination showed no cervical pain with good range of motion. His neurological examination was grossly intact except for nystagmus with intact sensation. (Id.).

Claimant correctly argues that the listing does not require documentation of every criteria at every exam. However, in order to meet an impairment listed in 20 C.F.R. pt. 404, Subpt. P, app. 1, a claimant must show that "his impairment meet[s] *all* of the specified criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 110 S. Ct. 885 (1990) (*emphasis added*). See also Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992). Claimant bears the burden of showing that he has a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months and prevents him from engaging in substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler, 461 U.S. at 460. The Commissioner has the ultimate responsibility of determining whether claimant is disabled. 20 C.F.R. § 416.903 (2007).

As the objective medical evidence shows, claimant did not experience nerve root compression, nor was there a single positive straight-leg raising test from the seated position; therefore, claimant's impairment did not manifest all of the specified medical criteria in listing 1.04A as required by Sullivan, 493 U.S. 521. Claimant cites Magistrate Judge Kaull's finding that there is "some evidence in the record of disc herniation, stenosis, pain, muscle spasm, significant limitation of motion of the cervical spine and radiation - every requirement under the

Listing" to support his contention that he has met all the requirements of listing 1.04. However, as was noted above, it is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary. Hays, 907 F.2d at 1456. Furthermore, the undersigned finds that while Magistrate Judge Kaull was correct in his assertion that claimant showed evidence of every requirement of the listing, the Court must note that Magistrate Judge Kaull's analysis of claimant's neck injury was done under listing 1.05C, not listing 1.04.[11]

Along with his argument that he has met all of the requirements of listing 1.04, claimant argues the ALJ's credibility determination was unreasonable and not based upon substantial evidence. This Court finds otherwise and affords the ALJ's credibility determination great weight. "Because he had the opportunity to observe the demeanor and to determine the credibility of the Claimant, the ALJ's observations concerning these questions are to be given great weight." Shively, 739 F.2d at 989 citing Tyler, 409 F. Supp. 776. The ALJ found that claimant's symptoms were magnified. This finding is supported by objective medical evidence from Dr. Hoffman that claimant was malingering with regard to his complaints of low back pain. (Tr. 414). On the other hand, claimant has done nothing to show that the ALJ's finding that his testimony was not credible. We will reverse an ALJ's credibility determination only if the Claimant can show it was 'patently wrong'" Powers, 207 F.3d at 435 citing Herr, 912 F.2d at

---

[11] Listing 1.05C did not require a showing of nerve root compression or a positive straight-leg raising test from the seated position. Listing 1.04 requires a claimant to show evidence of both in order to meet the listing.

181.

Because the objective medical evidence of record clearly shows claimant failed to meet all of the requirements of listing 1.04 and the fact that the ALJ's finding that claimant was not entirely credible was supported by substantial evidence, the undersigned finds the ALJ's analysis of listing 1.04 is sufficient based on the evidence of record and his finding is supported by substantial evidence.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be **DENIED** because the ALJ complied with the Fourth Circuit mandate set forth in Cook, 783 F.2d 1168 by explaining his rationale for concluding claimant's spinal impairment did not meet or equal listing 1.04.  The undersigned finds the ALJ's decision is supported by substantial evidence.

2. Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: October 16, 2008

/s/ *James E. Seibert*

JAMES E. SEIBERT

UNITED STATES MAGISTRATE JUDGE